MURDOCK, Judge,
concurring in the result.
The testimony in this case is often confusing and, as the majority notes, there are numerous inconsistencies in it. Nonetheless, among the testimony presented to the trial court that could be pertinent to the issues of “unfitness” and/or “voluntary relinquishment” is the following.
The grandmother, B.B., testified that she learned at the time her daughter became pregnant that R.O.M. might be the father of the child. W.K.D.J. (“the child”) was born in May 1995 and three months after his birth the grandmother began keeping the child. The father testified that he suspected in May 1996 that the child was his son.[2] About a year and one-half after the child was born, according to the grandmother, the child’s mother spent two weeks with R.O.M. and advised him that the child was his. Consistent with this testimony, B.B. also testified that R.O.M.’s visitation with the child began, through her informal consent, in January or February 1997, or about the time the child’s mother advised R.O.M. of his paternity. B.B. further testified that it was approximately two years later before a DNA test was performed. She stated that R.O.M. failed to appear for an earlier paternity test that had been scheduled and that a court order was required to force him to present himself for a second scheduled paternity test. B.B. further testified that, although the father was adjudged on June 20, 2000, to be the father of the child, during the time she has had custody of the child, the father never paid any child support until he was ordered by the court to do so in July 2001. B.B. also testified that R.O.M. knew how the child’s mother had mistreated the child, but he had not intervened or offered any assistance.
The father gives a slightly different version of events, including that he was first told of his paternity of the child approximately two years after the child’s birth. However, it was more than two years and seven months after the child’s birth before the father petitioned for custody and a paternity declaration in January 1998. Thus, even if the trial court believed the father’s testimony that he did not know that he was the child’s father until two years after the child’s birth, the court still could have inferred from that testimony that the father failed to assert his rights for approximately seven months after he was told he was the father of the child. There is also testimony from which the court could have inferred that the father *104 never sent the child any birthday or Christmas presents.
B.B. testified that when she would take the child to meet R.O.M. for weekend visits, the child often would go “kicking and screaming” and did not want to visit with R.O.M. B.B. stated that R.O.M. would be forced to “pick [the child] up bodily and put him in the vehicle to take him.” She testified that she observed bruises on the child following some visits, including bruises on one occasion to the child’s stomach, which, according to B.B., the child told her occurred because “[R.O.M.] was mad and pushed him down.” Other bruises occurred, according to B.B.’s recollection of her conversation with the child, from R.O.M.’s pushing the child down stairs. Among other things, both photographic and testimonial evidence was introduced of the existence on different occasions of bruises on the child’s face, on the upper inside area of his left leg, and on his buttocks. B.B. also testified, without objection, that the child told her that a bruise he once suffered under his right eye occurred because “R.O.M. had got mad at him because he wanted his Daddy[, T.J., the mother’s ex-husband to whom she was married when the child was born].” In addition, there were conflicts in the testimony of both R.O.M. and his wife from which the trial court could have made adverse credibility determinations, including conflicts as to whether the child always called R.O.M. “Daddy” or whether the child called him by his first name on some occasions, and whether the child cried while visiting with R.O.M. (I note that in the transcript of the in camera testimony of the child during the trial, the child, without exception, referred to R.O.M. using his first name.)
There was evidence indicating that B.B. cared for and loved the child and had provided a stable home for him for most of his life as if he were her own child. R.O.M. admitted that B.B. had a “loving and caring relationship” with the child and that he knew that there would be some “harm or anguish or upset” on the part of the child if he were taken from B.B.:
“Q. Does [B.B.] appear to love the child?
“A. Yeah.
“Q. Do they appear to have a loving and caring relationship?
“A. Yes, sir.
“Q. Have you ever thought about what harm or anguish or upset might happen to this child if he were ■ taken from this environment to live with you?
“A. Yes, I’ve thought about it.
“Q. You know there will be some, don’t you?
“A. Oh, yes.
“Q. A child would think it would be terrible, right?
“A. Oh, yes, but you know, me and him has talked about it and I want to be able to have my chance.”
R.O.M. further testified that he thought the child attended “Valley Junior High,” but that he had never visited him in school or had any conferences with his teachers.
B.B. also testified without objection that R.O.M.’s wife had called the child “a son of a b.... ” on one occasion when he opened a door too wide and hit some furniture, and that there were other instances of this nature involving R.O.M.’s wife. B.B. testified that the child “looks [to] me to protect him.”
Among other things, the child testified in camera as follows:
“THE COURT: Okay. Do you know what we’re doing here today?
“[CHILD]: Yeah, child support and I don’t like it.
*105 “THE COURT: You don’t like child support? Why?
“[THE CHILD]: Because I don’t like [R.O.M.] Do you know what he does to me?
“THE COURT: Nuh-uh.
“[THE CHILD]: He just beats me, mean, mean, mean.”
The child also testified that R.O.M.’s wife had a bad temper and that on one occasion she beat him to the point that he, R.O.M., started crying. The child also testified that R.O.M. and his wife have another man, named Danny, a “friend” who lives with them. The child also testified as follows:
“[THE CHILD]: ... And [R.O.M.] busted — see that right there?
“THE COURT: Uh-huh.
“[THE CHILD]: That’s where he busted my lip.
“THE COURT: How did he do that?
“[THE CHILD]: Just slapped me, it was bleeding, it was coming out of my mouth.
“THE COURT: Did he slap you because he was mad at you or was it an accident?
“[THE CHILD]: Mad at me....
“[THE CHILD]: ... I hate [R.O.M.] Do you know he does a lot mad.... ”
The child also stated on the record that he wanted to live with B.B.
In addition, I note that B.B. played for the court several audiotape recordings of the child’s conversations with her and his reactions to going to visit with R.O.M. These tapes were made in a car on the way to the visits. It is well established that we assume that missing parts of the record support the trial court’s judgment. Leverett v. Leverett, 828 So.2d 320 (Ala.Civ.App.2002) (citing Eagle Bail Bond v. State, 757 So.2d 433, 436 (Ala.Civ.App.1999)).
The majority opinion states that the “only undisputed fact” that might support a finding of voluntary relinquishment of the child is the fact that the father failed to pay child support. I agree that this may be the only undisputed fact regarding a possible relinquishment, but it may not be the only fact which the trial court could discern from the evidence. Nonetheless, as we recently noted in R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002), this court is bound by the holding of our Supreme Court in Ex parte D.J., 645 So.2d 303 (Ala.1994). Ex parte D.J. stands for the proposition that if the issue in a custody ease is whether a parent has voluntarily relinquished that custody, a trial court may not consider evidence of the parent’s actual physical or psychological abandonment of the child that occurs before the parent is legally declared by a court to be the parent. See R.K., supra. Accordingly, I would have to agree that the holding in Ex parte D.J. would not tend to be supportive of a finding of voluntary relinquishment in the present case.
As to the issue of unfitness, it was the trial court’s responsibility in the ore tenus hearing in this case to sort through conflicting testimony, make credibility determinations, weigh the testimony, and draw such inferences and make such findings as necessary to resolve conflicts in the testimony.
“‘Our standard of-review is very limited.... A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the *106 trial court would be to reweigh the evidence. This Alabama law does not allow.’ ”
Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (citations omitted) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)). Further, where a trial court has made no express findings of fact, this court normally will assume that the trial court made those findings necessary to support its judgment. See Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997). Judge Crawley is correct, however, to the extent he notes in his special writing in this case, that this court has held that, before a trial court may choose a nonpar-ent over a parent in a custody dispute where the issue is the parent’s alleged unfitness, the court must make an express finding that the parent is unfit. See, e.g., J.L. v. L.M., 805 So.2d 729, 733 (Ala.Civ.App.2001). Because the trial court did not do this in the present case, I agree that the cause must be remanded.

. At another point in his testimony, the father testified with respect to the child that "they kept him from me for two years.”